UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JUDGE PATTERSON

05 CV 6323

Case No.

---

DONALD J. TRUMP,

                    Plaintiff,

        - against -

HENRY CHENG, VINCENT LO, CHARLES
YEUNG, EDWARD WONG, DAVID CHIU,
HUDSON WATERFRONT CORP.,  HUDSON
WATERFRONT I CORP., HUDSON
WATERFRONT II CORP., HUDSON
WATERFRONT III CORP., HUDSON
WATERFRONT IV CORP.,  HUDSON
WATERFRONT V CORP., HUDSON WESTSIDE
ASSOC. I, L.P.,  HUDSON WESTSIDE ASSOC. II,
L.P., HUDSON WESTSIDE ASSOC. III, L.P.,
HUDSON WESTSIDE ASSOC. IV, L.P., HUDSON
WESTSIDE ASSOC. V, L.P., JOHN DOE I and
JOHN DOE II,

                    Defendants.

JURY TRIAL DEMANDED

COMPLAINT

RECEIVED
JUL 11 2005
U.S.D.C. S.D. N.Y.
CASHIERS

---

Plaintiff DONALD J. TRUMP ("Trump"), by his undersigned counsel, Kasowitz,

Benson, Torres & Friedman LLP, for his complaint, alleges as follows:

## Preliminary Statement

1.      This case arises from a staggering breach by defendants of the most basic

fiduciary duties of care and loyalty.  The defendants are partners with Trump in one of the most

valuable and important real estate properties in New York City.  In breach of the stringent

fiduciary duties defendants owed to Trump, the defendants -- over Trump's repeated loud

protests  -- agreed to sell the property for $1.76 billion, at the same time that they had unsolicited

offers from leading real estate investors to pay almost double that amount.

2.      The defendants inexcusably refused to consider such offers or to take even the most minimal steps necessary to determine the true market value of the property.  Instead, they accepted the lowest (by over $1 billion) available bid.  Thus, even though Trump stands to personally gain approximately 30% of the $1.76 billion price, had defendants honored their duties to seek the best and highest price for the property, Trump and defendants would have garnered well over an additional $1 billion.  This amount does not include hundreds of millions of dollars of profit that Trump created from building the condominium towers, which monies have not been distributed so that the Cheng Group can avoid paying taxes in China and the United States.  Defendants' conduct constitutes an egregious breach of their fiduciary duties that can only be attributed to gross negligence, undisclosed conflicts of interest, or self-dealing.

3.      At issue is the irreplaceable waterfront property on the west side of Manhattan known as Trump Place and Riverside South ("Trump Place").  Trump Place is one of the largest single private developments in New York City's history, which Trump has developed into one of the city's premiere luxury residential enclaves.  Defendants, Trump's partners in the development project, are a consortium of Chinese investors led by defendants Henry Cheng, Vincent Lo, Charles Yeung, Edward Wong, and David Chiu (collectively, the "Cheng Group").  The partners jointly developed the site, and the Cheng Group was entrusted with certain additional responsibilities, including responsibility for decisions on selling some, or all, of the property.

4.      Defendants have breached the fiduciary duties they owed Trump in several respects.  First, they agreed to sell, over Trump's repeated protests, Trump Place for $1.76 billion, without having taken the most basic steps to ensure that price was the best price that could be obtained or even near the property's known market value.  Second, in connection with the sale, the Cheng Group misrepresented to Trump the amount of partnership distributions they

2

had made to themselves, provided false records to conceal their misrepresentation, and resisted Trump's requests for documents that would have revealed the fraud. Despite such active concealment and obstruction, Trump has to date uncovered fraud by the Cheng Group amounting to at least $19,666,459. Finally, apparently recognizing that their sale of the property was a gross violation of their fiduciary duties, defendants improperly demanded that Trump agree, among other things, to provide them with a complete release exonerating them for their misconduct.

5.     Trump brings this action to recover the damages resulting from defendants' unlawful conduct — in the amount of at least $500 million — and to prevent further substantial and irreparable harm by defendants' continuing wrongdoing.

### The Parties

6.     Plaintiff Donald J. Trump, an individual residing at 725 Fifth Avenue, New York, N.Y. 10022, is a preeminent real estate developer in New York City and the world. Mr. Trump is a member of the Hudson Waterfront development partnership (the "Partnership"), in which the Cheng Group are also members. The Partnership owns a real estate development site on the west side of Manhattan through various limited partnership ("L.P.") development vehicles. The Cheng Group serves as each L.P. vehicle's general partner (through a wholly-owned entity) and also holds a limited partnership interest in each vehicle (again through a wholly-owned entity). Trump owns the other limited partnership interest in each L.P. vehicle.

7.     Defendant Henry Cheng ("Cheng") is a citizen of China, residing in Hong Kong. Cheng is the chairman of New World Development, a worldwide mixed-use real estate development company, and reputedly is one of the world's richest men, with an estimated net worth of over $4 billion.

3

8.      Defendant Vincent Lo ("Lo") is a citizen of China, residing in Hong Kong.  Lo is chairman of Shui On Construction and Materials Ltd.

9.      Defendant Charles Yeung ("Yeung") is a citizen of China, residing in Hong Kong. Yeung is the chairman of Glorious Sun Enterprises which sells clothes in retail establishments across the United States, including New York.

10.     Defendant Edward Wong ("Wong") is a citizen of China or Singapore, residing in Hong Kong.  Wong is the founder and chairman of the Edward Wong Group, which, among other things, owns and manages properties across the world, including in the United States and Canada.

11.     Defendant David Chiu ("Chiu") is a citizen of China, residing in Hong Kong. Chiu is the chief executive officer of Malaysia Land Properties, which develops both residential and commercial buildings throughout Asia.

12.     Defendants Hudson Waterfront Corporation, Hudson Waterfront I Corporation, Hudson Waterfront II Corporation, Hudson Waterfront III Corporation, Hudson Waterfront IV Corporation, and Hudson Waterfront V Corporation, are all Delaware corporations, with their principal places of business in Hong Kong.  Each is wholly owned by, and the alter ego of, the Cheng Group and the entity through which the Cheng Group serves as the general partner of each L.P. vehicle.

13.     Defendants Hudson Westside Associates, L.P., Hudson Westside Associates I, L.P., Hudson Westside Associates II, L.P., Hudson Westside Associates III, L.P., Hudson Westside Associates IV, L.P., and Hudson Westside Associates V, L.P. are Delaware limited liability partnerships, with their principal places of business in Hong Kong.  Each is wholly

owned by, and the alter ego of, the Cheng Group and the means through which the Cheng Group holds its limited partnership interests in each L.P. vehicle.

14.     John Doe I and John Doe II are entities or individuals not now known who aided, abetted, participated, and conspired with the Cheng Group to commit the acts that are the subject of this complaint.

## Jurisdiction and Venue

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2), as this is an action between a citizen of a State and citizens or subjects of a foreign state and aliens, there exists complete diversity, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

16.     This court has personal jurisdiction over the defendants named in this action, as defendants (a) transact business within the State; (b) have committed, and continue to commit, tortious acts within the State; (c) have committed, and continue to commit, tortious acts without the state causing injury within the State, and regularly do or solicit business here, derive substantial revenue from interstate commerce and should reasonably expect their acts to have consequences here; and/or (d) own and use real property in the State.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(a), as (a) the subject matter, events and omissions giving rise to the claims occurred in this District; (b) the property that is the subject of this action is situated in this District; and (c) defendants are subject to personal jurisdiction in this District.

**Statement of Facts**

A.   **The Irreplaceable Trump Place Project**

18.    Since the early 1970's, New York City developers have sought to develop the former Penn Central rail yards located on the Hudson River waterfront between West 59th and 72nd Streets in Manhattan.  This swath of vacant, developable waterfront land in the heart of New York City was, and is, an incomparable and irreplaceable piece of real estate.

19.    In 1991, Trump secured the unprecedented support of civic and community groups and the necessary government approvals to develop the property.  When completed, the 92-acre development -- Trump Place -- would include 16 apartment buildings with 5,700 residential units, at least 1.8 million square feet of commercial space or additional residential space, 300,000 square feet of retail space, large scale parking facilities and a 22-acre waterfront park.  As such, it is the largest single private development in New York City history.

20.    In 1994, Trump selected the Cheng Group from among several groups eager to be partners with Trump in Trump Place.  The resulting Partnership was, and still is, referred to as the Hudson Waterfront partnership.  As described on the Trump Place website, in addition to Trump, "the Hudson Waterfront development partnership includes Messrs. Henry Cheng, Vincent Lo, Charles Yeung, Edward Wong, and David Chiu."

21.    The Partnership planned to develop various parcels of the property in several stages.  Each development stage and parcel would be pursued through a separate L.P. development vehicle whose terms mirrored those of the overall Partnership.  Trump and the Cheng Group share responsibilities for developing and managing the Partnership, with the Cheng Group being entrusted with the responsibility, among other things, for evaluating offers to

purchase all or part of the property.  With the benefit of Trump's reputation and participation,

Trump Place has become the premiere luxury residential enclave in New York City.

**B.**     **The Cheng Group Sells the Property Over Trump's Objection**
       **for At Least $ 1.2 Billion Less Than Its Known Market Value.**

22.     In or about 1998, the Cheng Group informed Trump that they had decided to sell

the property.  At the time, Trump informed them in writing that doing so would be a "very bad

and destructive idea" because it was a "fire sale" and they "would make much more money"

instead by holding the property in the "strongest real estate market in [New York City's] history,"

which he predicted would only continue to strengthen.  With much effort, Trump ultimately

convinced the Cheng Group not to sell at that time.  As a result of Trump's advice, they avoided

the dubious distinction of selling one of the most valuable properties in New York City before

one of the hottest real estate markets in the city's history.

23.     In or about late 2004, unbeknownst to Trump, the Cheng Group again began

considering selling the property.  Despite Trump's incomparable and far superior market

knowledge and his correct and exceedingly prescient advice in 1998, the Cheng Group did not

consult with Trump in making that decision.  Had he been consulted, Trump would have agreed

that in view of market conditions, a sale was now advisable, but he would also have advised that

the property would need to be properly positioned for sale in order to capitalize fully on the

market.  Specifically, among other things, the Partnership would need, at a minimum, to advise

leading regional, national, and international brokers of the property's availability, to aggressively

market the property, and to solicit multiple competing bids through a standard request for

proposal ("RFP") process.  Of course, such steps are standard operating procedure for selling

properties far less valuable than Trump Place, and constitute a minimal standard of care for those responsible for such tasks.

24.     Inexplicably, however, the Cheng Group did not take such steps.  They failed to properly advise or consult with leading brokers, to market the property appropriately, or to solicit competing bids.  Indeed, even Trump, one of the most informed real estate developers in New York City, was unaware that this most valuable property, in which he owned a major interest, was for sale.

25.     In late April 2005, the Cheng Group paid a surprise visit to Trump to inform him that they had sold the property.  Trump queried how one of the most valuable parcels of Manhattan real estate could be for sale -- let alone sold -- without anyone knowing about it, especially a leading real estate developer with a substantial ownership interest in the property. The Cheng Group merely responded that they had "made a deal" with Gary Barnett ("Barnett"), a developer that Trump had never even heard of, for $1.76 billion.

26.     Trump told the Cheng Group that the sale they described would be an egregious error.  While 30% of $1.76 billion provided a very high return to Trump personally, he told them the price was nevertheless at least $1 to 1.5 billion below the prevailing market value. Reminding defendants that he had saved them from a similar mistake years earlier, Trump stated that they were obliged and had a fiduciary responsibility to maximize the property's sale value but were doing nothing to capitalize on the most favorable seller's market in history. Accordingly, Trump demanded that no sale take place until additional bidding had been solicited. In response, the Cheng Group revealed for the first time that the letter of intent they had signed with Barnett was non-binding.

27.     Trump thereafter continued to press the Cheng Group to market the property before selling. For example, on April 28, 2005, Trump wrote Cheng that Mercedes Benz was keenly interested in just a fraction of the parcel and that, if the property were put up to bid, the existing sales price would soar:

> Mercedes Benz, through Matthia Gehrmann is very interested in purchasing a major 500,000 square foot section of parcel N. He just left my office and I believe that Mercedes is willing to pay a very substantial price. Bidding wars are going wild now in New York City and I truly feel that our property would be worth substantially more than the numbers being discussed if it were opened up to other bidders.   Do you have any thoughts on this?
>
> *               *               *
>
> p.s. When I convinced you not to sell the buildings four years ago, I provided a great service to the partnership – they are worth far more money today.  In this case I think the timing is right to sell, but I firmly believe you can get a much higher price!

28.     Cheng did not respond for almost a week.  When he respond he acknowledged that selling the property in parcels might generate a higher price, but that doing so would be "time consuming and would take a long time . . ." Likewise, while he acknowledged that "an open bidding process is another way of generating interest and offers," he showed no interest in pursuing that standard practice.

29.     Trump responded by making clear that the issue was not whether to sell the property in parcels but the need to put the property out for bid:

> I greatly appreciated your letter. However, I wasn't talking about selling the site in small or individual parcels but rather selling the whole site in that the New York City real estate market is so tremendously hot.  Everybody is calling and wanting to buy the entire site . . . . I was merely using Mercedes-Benz as an example of the level of interest . . . .

The Cheng Group nonetheless ignored Trump and did not take the most basic steps necessary to maximize the property's sales value.

30.     Moreover, consistent with Trump's prediction, Barnett, apparently in concert with financial backers including the Carlyle Group -- a large financial investment vehicle funded by mostly Middle Eastern capital -- proceeded to do what defendants themselves should have done -- market the property to third parties.  As word spread, interested and motivated potential purchasers began contacting Trump and the Cheng Group to express their interest in buying the property at prices far in excess of Barnett's proposal.

31.     One such potential purchaser was Colony Capital LLC ("Colony"), one of the world's largest private international real estate investment firms.  Since 1991, Colony has invested over $13.9 billion in over 7,656 assets through various corporate, portfolio, and complex property transactions.  In early May, Thomas Barrack, Jr., the Chairman and CEO of Colony, attempted repeatedly to reach the Cheng Group to bid on the property.  When those calls were never returned, on May 18, 2005, Mr. Barrack wrote to the Cheng Group with an initial and unsolicited offer of $2.9 billion:

> I have tried to contact you several times without success with regard to our
> sincere interest in acquiring the property commonly known as the "Trump West
> Side Project."  We are willing to acquire all rental building and developable
> property for $2.9 billion.  Should you have an interest, please contact me directly
> . . . .

Of course, as an initial offer, the $2.9 billion probably did not amount to the highest price Colony was prepared to pay.

32.     Although there was no binding contract with Barnett at that time, the Cheng Group ignored Colony's letter offering $1.2 billion more than their letter of intent with Barnett. They also omitted to inform Trump of the offer.

33.     Similarly, on May 20, 2005, Trump informed Cheng that leading New York City developer Richard LeFrak had made an initial and unsolicited bid of $3 billion, not even

including the extremely valuable underground garages that were included in the pending $1.76

billion letter of intent with Barnett.  Trump again implored the Cheng Group to consider these

vastly superior offers and avoid the "tragic" mistake they appeared determined to commit:

> I have just received an unsolicited offer from Richard LeFrak, one of the
> largest and most respected developers in New York, to purchase the West Side
> Rail Yards for $3 billion.  Obviously, the market is beginning to hear that the
> property is for sale.  LeFrak is very familiar with the Yards, their zoning and
> values.  This $3 billion offer does not include the parking lots under the
> condominium buildings.
>
> As I have said to you in previous letters, the New York market is better
> than ever before and you should be able to get a far higher price than the $1.760
> billion you are currently discussing.
>
> Please let me know what you want me to do with the LeFrak offer.  If in
> fact the land and rental buildings are worth $3 billion or more, you are making a
> tragic mistake selling them for $1.760 billion.

The Cheng Group again refused to even consider the offer.

34.    On May 23, 2005, Trump finally learned about Colony's previous $2.9 billion

opening bid from a representative of Cheng.  Having not been previously informed of that offer

and not having received a response to his LeFrak letter, Trump wrote again to insist the Cheng

Group act on the offers:

> Barry [Gross] has told me that you have received an unsolicited offer from
> Colony Capital for $2.9 billion. This is in addition to the $3 billion unsolicited
> offer by LeFrak. What are you going to do about this situation?

The Cheng Group did not respond.  Nor did it explore either of these opening bids from leading

industry participants even though they had yet to sign a binding contract with Barnett.

Additionally, Barry Sternlicht of Starwood Hotels called Trump to inform him that he wanted to

buy the site.  Mr. Trump referred Sternlicht to Cheng, but Cheng refused to talk to him or to

otherwise follow up on Starwood's interest.

35.     On June 2, 2005, the <u>New York Times</u> reported the pending $1.76 billion deal with Barnett.  Leading real estate developers and investment firms immediately contacted Trump to express their shock at the sales price, dismay that they had not been afforded an opportunity to bid, and their continued eagerness to submit opening bids well in excess of the reported sales price.  Trump reported these expressions of interest to the Cheng Group and demanded that they follow up.  They did not.  The Cheng Group received similar overtures, and likewise did nothing.

36.     In the face of such reckless indifference, on June 7, 2005, Trump informed defendants that their refusal to market the property, permit bidding, or consider the vastly superior offers was flatly contrary to their fiduciary and other agreed upon Partnership obligations.  The Cheng Group did not respond and did nothing.

37.     On or about June 14, 2005, Trump reiterated Starwood's interests to the Cheng Group's lawyer and demanded that the Cheng Group consider the several competing offers that were outstanding, explore others, and not enter into a binding agreement to sell the property for over $1.2 billion less than competing offers already received:

> We believe that your client must listen to the market.  If there is interest at higher prices than what your client is currently negotiating, I implore you and your client to take advantage of an unprecedented market for an irreplaceable development site.

38.     The next day, Cheng called Trump.  Trump noted that the market had once again proven him correct and that Cheng could not deny that his proposed sale was at least $ 1.2 billion below the known market floor.  Cheng did not dispute this fact.  To the contrary, he acknowledged it by admitting that he expected Barnett to immediately "flip" a portion of the property to another buyer at a substantial profit.   Nevertheless, reflecting utter indifference to the best interests of the Partnership, Cheng insisted that his group did not intend to pursue

alternatives. Trump insisted that Cheng put a "no flip" provision in the sales contract. Cheng refused Trump's request for the inclusion of such a provision routinely used in real estate sales contracts of this magnitude to protect the seller's interests.

39.     Thus, by (and indeed long before) June 15, 2005, the Cheng Group knew that the still nonbinding letter of intent to buy the property for $1.76 billion was at least $1.2 billion less than the property's known market value. They also knew that they had no obligation to sell the property at that absurdly low market price, but could instead accept one of the existing far superior offers or seek still more bids. Nevertheless, on June 17, 2005, they signed a contract of sale with Barnett binding them to sell the property for $1.76 billion.

40.     At best, the Cheng Group's conduct was extreme gross negligence. At worst, the Cheng Group's actions were motivated by self-interest and self-dealing. Given the nature of their inexplicable conduct, however, logic permits no conclusion other than that their actions constituted intentional misconduct motivated by financial and other relationships that defendants have and hope to develop with, among others, Barnett's financial backers, including the Carlyle Group and Extell Development Co.

41.     Indeed, the Cheng Group had previously engaged in other substantial self-dealing in exercising their Partnership responsibilities. For example, in 2005, the Cheng Group submitted to Trump false financial statements understating by at least $19,666,459 the disbursements that they had made to themselves up to that point. When, in the course of reviewing certain information, Trump representatives requested documents that would have revealed this fraud, the Cheng Group stonewalled and when they ultimately provided the requested documents, they omitted those that incriminated them in the fraud.

C.    **The Cheng Group Improperly Pressures Trump To Surrender His Rights.**

42.    In parallel with their sale of the property to Barnett, the Cheng Group also sought to obtain an agreement with Trump concerning the redemption of his Partnership interests and use of the sale proceeds. The drafts of this agreement provided to Trump included a provision purporting to empower the Cheng Group to invest the proceeds in another unidentified property in order to avoid paying United States and China taxes. Thus, after selling possibly the best real estate investment in New York City -- over Trump's objection -- for at least $1.2 billion less than it was worth, the Cheng Group sought authority to reinvest Trump's proceeds in an unknown property, of unknown investment quality, in an unknown location. No Partnership instrument gave the Cheng Group authority to pursue this exchange.

43.    In addition, after Trump uncovered their $19,666,459 fraud and continued to object to their sale decision, the Cheng Group informed Trump that the redemption agreement would need to include a full release of any claims Trump might have against them. Again, no partnership instrument contained any such requirement. Rather, those instruments made clear that the Cheng Group would, among other things, be liable where (as here) they breached their fiduciary duties or otherwise acted in bad faith, with gross negligence, or in a manner inconsistent with the best interests of the Partnership. Again, Trump refused to agree to any requirement that he waive rights as a condition of receiving the monies to which he was undeniably entitled.

44.    As yet further evidence of its bad faith and utter disregard for its fiduciary obligations, the Cheng Group then used their partnership powers to threaten Trump into bowing to their demands. Specifically, they refused to proceed with the redemption agreement or to otherwise distribute the sales proceeds to Trump unless he provided a full release and agreed to

14

permit a transaction in which the Partnership would re-invest the sale proceeds from the Trump

Place sale in another unknown property to effect a so-called tax-free exchange.  In addition, the

Cheng Group has likewise withheld hundreds of millions of dollars in profits Trump created

from the building of the condominium towers, which the Cheng Group has not distributed so as

to avoid taxes in China and the United States.

### Causes of Action

### Count I
### (Breach of Fiduciary Duty Against
### All Defendants Other Than
### John Doe I and John Doe II)

45.    Trump repeats and realleges each and every allegation contained in paragraphs 1

through 44.

46.    Defendants were fiduciaries of Trump as partners in the Partnership and all the

Partnership entities through which that Partnership operated.  Defendants in particular owed the

most stringent of partnership duties because they were entrusted with responsibilities and

authority over, among other things, whether the Partnership and all the L.P. entities would sell

the property or parts thereof.

47.    Defendants breached their fiduciary duties of care and loyalty as well as their

obligations to Trump under the various Partnership instruments, or knowingly participated in

such breaches, by (a) pursuing the sale of the property in a reckless, uninformed, and grossly

negligent manner and/or intentionally to the detriment of the partnership and Trump to further

their own interests and those of others above Trump's interests; (b) misappropriating and/or

attempting to misappropriate Partnership assets; (c) falsifying and/or attempting to falsify

Partnership records; and (d) abusing their Partnership powers to deprive Trump of the very partnership rights they are obligated to serve.

48.     By reason of the foregoing breaches of their fiduciary duties and duties under various Partnership interests, Trump has been damaged in an amount to be determined at trial but no less than $1 billion in compensatory and punitive damages.

## Count II
### (Aiding, Abetting, and Participation Against All Defendants)

49.     Trump repeats and realleges each and every allegation contained in paragraphs 1 through 44.

50.     Defendants knowingly and intentionally, aided, abetted, and participated in violations of the fiduciary duties owed to Trump by substantially assisting in the (a) pursuit of the sale of the property in a reckless, uninformed, and grossly negligent manner and/or intentionally to the detriment of the Partnership, and/or furthering their own interests and those of others above Trump's interests; (b) misappropriating and/or attempting to misappropriate Partnership assets; (c) falsifying and/or attempting to falsify Partnership records; and (d) abusing their Partnership powers to deprive Trump of the very partnership rights to which he is entitled.

51.     By reason of the foregoing, Trump has been damaged in an amount to be determined at trial but not less than $1 billion in compensatory and punitive damages.

## Count III
### (Conspiracy Against All Defendants)

52.     Trump repeats and realleges each and every allegation contained in paragraphs 1 through 44.

53.     Defendants individually and collectively, knowingly, intentionally and corruptly agreed, conspired, and acted in unison for advantage to violate the fiduciary duties owed to

Trump by lying about or assisting in the (a) pursuit of the sale of the property in a reckless, uninformed, and grossly negligent manner and/or intentionally to the detriment of the Partnership and/or furthering their own interests and those of others above Trump's interests; (b) misappropriating and/or attempting to misappropriate Partnership assets; (c) falsifying and/or attempting to falsify Partnership records; and (d) abusing their Partnership powers to deprive Trump of the very partnership rights to which he is entitled.

54.     By reason of the foregoing, Trump has been damaged in an amount to be determined at trial but not less than $1 billion in compensatory and punitive damages.

### Count IV
### (Tortious Interference With Fiduciary Relationship Against All Defendants)

55.     Trump repeats and realleges each and every allegation contained in paragraphs 1 through 44.

56.     Defendants tortiously interfered with the fiduciary duties owed to Trump by inducing, encouraging, causing, or assisting in the (a) pursuit of the sale of the property in a reckless, uninformed, and grossly negligent manner or intentionally to the detriment of the Partnership for the purpose of furthering their own interests and those of others above Trump's interests; (b) misappropriating and/or attempting to misappropriate Partnership assets; (c) falsifying and/or attempting to falsify Partnership records; and (d) and abusing their Partnership powers to deprive Trump of the very partnership rights to which he is entitled.

57.     By reason of the foregoing, Trump has been damaged in an amount to be determined at trial but not less than $1 billion in compensatory and punitive damages.

**Count V**
**(Breach of Contract Against**
**All Defendants Other Than**
**John Doe I and John Doe II)**

58.     Trump repeats and realleges each and every allegation contained in paragraphs 1 through 44.

59.     Defendants were, by contract, partners of Trump in the Partnership and under various Partnership instruments, and were required, among other things, to operate and develop Trump Place in the best interest of the Partnership.

60.     Defendants breached their contractual obligations to Trump under the various Partnership instruments, or knowingly participated in, or brought about, such breaches, by, among other things, (a) pursuing the sale of the property in a reckless, uninformed, and grossly negligent manner and/or intentionally to the detriment of the partnership and Trump to further their own interests and those of others above Trump's interests; (b) misappropriating and/or attempting to misappropriate Partnership assets; (c) falsifying and/or attempting to falsify Partnership records; and (d) abusing their Partnership powers to deprive Trump of the very partnership rights they are obligated to serve.

61.     By reason of the foregoing, Trump has been damaged in an amount to be determined at trial but not less than $500 million in compensatory damages.

**Count VI**
**(Constructive Trust)**

62.     Trump repeats and realleges each and every allegation contained in paragraphs 1 through 44.

63.     Defendants breached their fiduciary duties owed to Trump by (a) selling, or inducing, encouraging, causing or assisting in the pursuit of the sale, of the property in a reckless,

uninformed, and grossly negligent manner or intentionally to the detriment of the Partnership for the purpose of furthering their own interests and those of others above Trump's; (b) misappropriating and/or attempting to misappropriate Partnership assets; (c) falsifying and/or attempting to falsify Partnership records; and (d) abusing their Partnership powers to deprive Trump of the very partnership rights to which he is entitled.

64.     Defendants have thereby improperly secured for themselves value, benefits and assets that properly belong to Trump.

65.     By reason of the foregoing, Trump is entitled to the imposition of a constructive trust for the benefit of Trump on all property or assets improperly transferred in violation of the defendants' fiduciary duties.

**Count VII**
**(Injunctive Relief Against**
**All Defendants Other Than**
**John Doe I and John Doe II)**

66.     Trump repeats and realleges each and every allegation contained in paragraphs 1 through 44.

67.     Defendants continue to threaten to proceed with their breaches of fiduciary duty and violations of their obligations under the various Partnership instruments and such misconduct can and will result in substantial and irreparable harm to Trump, for which there is no adequate remedy at law.

68.     By reason of the foregoing, Trump is entitled to preliminary and permanent injunctive relief preventing further breaches of defendants' fiduciary duties, including, but not limited to, enjoining improper transfers of Partnership assets and monies in violation of their

fiduciary duties, the exchange of Partnership assets for other investment properties, and the refusal to honor Trump's right to any Partnership proceeds.

### **Prayer for Relief**

**WHEREFORE,** Trump demands judgment against defendants:

(a) On Counts I, II, III, IV and V, awarding Trump compensatory and punitive damages in an amount not less than $ 1 billion in compensatory and punitive damages plus interests and costs;

(b) On Count VI, imposing a constructive trust;

(c) On Count VII, enjoining defendants from further breaching their fiduciary duties, including but not limited to, any exchange of partnership investment assets for other investment assets and refusal to honor Trump's rights to such assets; and

(e) Awarding Trump such other and further relief as the Court may deem appropriate.

## Jury Demand

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.


Dated: New York, New York
      July 11, 2005

                              Respectfully submitted,


                              KASOWITZ, BENSON, TORRES
                              & FRIEDMAN LLP

By: _____
                            Marc E. Kasowitz (MK-2597)
                            Daniel R. Benson (DB-6587)
                            Michael J. Bowe  (MB-7205)
                            Jennifer S. Recine (JR-6614)
                          1633 Broadway
                          New York, New York  10019
                          (212) 506-1700

                          Counsel for Plaintiff Donald J. Trump